in this beautiful city of New Orleans. When we go through airports or customs or any place like that, we provide documents. Those documents are immediately scanned. That's the first thing an officer does, whether it's a TSA, whether it's a customs or border patrol. This officer, however, Border Patrol Agent Flores, he did not do that. He walked around for about three minutes with my client's documents in his hand. Now, he did different things. The first thing he did, within three seconds, he had the documents in his hand. Then he asked a couple of questions. And then within fifteen seconds or seventeen seconds, he stuck his head in the back of my client's vehicle. He saw some suitcases. And noticing that he didn't have his K-9 around, which the K-9s are always there, he decides to go and wave for an agent with the K-9 to come over to inspect the vehicle. Now, when he does this, instead of going and scanning those documents, he's got the documents in his hand already minutes gone by. Instead of going back and scanning the documents, he just waits around for that agent to come and bring that dog around the car. Meanwhile, Agent Flores is doing nothing. He's got those documents. He should scan them. Was the luggage large enough to hide a person in? Well, the luggage was large enough to hide a person in. However, Agent Flores, under questioning of Judge Hacker, said, I was satisfied that there was no more people in the vehicle. Those are his words. He says at 108, Judge Hacker asked him, but do you think the K-9 is going to help – I'm sorry. He says, but what do you think this K-9 is going to help you find? Are you looking for drugs? Are you looking for people? Are you looking for both? I mean, I don't know what's going through your mind of why you stop and call the K-9 over. Answer, well, it's a tool that we can use. In my experience, we've caught drugs. We've caught illegal aliens. Judge Hacker, I guess what I'm asking, are you satisfied with the number of people in the car at that point? Answer, yes. And so he's not looking for an immigration inspection. He's done with his immigration inspection. He's done with it. He's got the visas in his hand. He can tap them. He cannot tap them, but he's got the visas. He doesn't need to tap them, but he doesn't want to tap them. The very last thing he does, the very last thing he does three minutes later is tap those visas. It takes all of eight seconds when he taps those visas to get any information that he wants. Physically, what does he – once he has the documents in his hand, what does he do with them? That is, he scans them. In other words, does he have to walk some distance or – how does he – I'm having a hard time visually seeing what's happening. There's an automobile. There's an automobile window. He's in a toll booth that's this far away. He steps off of – You're standing about three feet back. Yeah, two or three feet. So he's here. He's here. He scans them right there. And so when he comes out, there's a line of traffic. You can see the line of traffic. He stands by his booth. His booth is right here and his computer is right here. And so what he's doing is he is – if we look at all the cases, all the cases that were cited by the government, that are cited by us, all the cases that are always cited about checkpoints are that it's immigration first. It's immigration first. That's the only purpose is immigration. In fact, Portillo Aguirre says it bears repeating that the permissible duration of an immigration stop is the time reasonably to determine the citizenship status of persons. That's why he's there for immigration. However, the one thing that always gets done immediately at the port of entry when we travel abroad, when we travel to Mexico or Europe or when we – even the airport. I'll ask you another question. Yes, sir. About the sequence of events. The agent walks up. He's standing at the side of the vehicle. He has the documents in his hand, and he's asking questions at that time? He asked a couple of questions. All right, but he asked where you're going. He asked where you're going and what is the purpose of your trip. Okay, and what responses did he get? The response is I'm going to San Marcos, Texas, which is about two and a half hours from that point. And then he says that he's going to the outlet malls in San Marcos, Texas. Well, I thought he was going out to do some shopping or get some product or whatever it was, but the travel distance would say that nothing's going to be open when he gets there. Well, it was 5 p.m., and he said that it would be late when he got there, not that it wouldn't be open, but that it would be late when he got there. Let's assume that his responses to the answer at the least raised suspicion as to whether he was being told – given accurate information as to where he was going. What, if anything, do we do with that circumstance? Well, I mean he's given this information, and he's later saying that he thought that – he didn't like the information. He thought that – I thought he was suspicious, didn't he? He said the defendant said I'm not going to spend the night, I'm going to go buy the $5 shirts, and I'm not spending the night. And then the officer thought I don't know any place that you can buy $5 shirts. He's not likely to get there before the mall closes, and even if he did, it doesn't make sense that he would turn around and drive back. Well, and these are conclusions that the officer is making, but he doesn't ever – when he's asked about it, he doesn't ever say that that gives him suspicion of drugs, just that he thinks that this is the appropriate time to bring in a canine. Officer, look, it's an inspection station, and its purpose is for illegal aliens, whatever, and he's looking at the papers. To verify the – he'll get more information when he turns the machine. But I don't know – I know nothing that says that he can't ask questions while it's the same moment in time. He's got to engage him in some kind of conversation. And so he gets the documents, where are you guys going? And then he gets this answer back that doesn't make sense. In other words, he gets reasonable suspicion at that particular point in time. Why isn't he at that time entitled to reach over and get a dog just a few feet away to bring the dog over? And then he proceeds – where is the invasion of rights at that juncture? Well, I don't see the reasonable suspicion. But if there is reasonable suspicion, like Your Honor is saying, if there's reasonable suspicion, then he can detain the vehicle. So – Everything spends on – at least in threshold questions whether we have reasonable suspicion. The officer had reasonable suspicion in response to the questions he had before he turned with the documents, right? Well, it would turn on that. But it doesn't really matter about the documents, the sequence. He had reasonable suspicion at that point. And if he did, then he was entitled to bring that dog over. Well, and I agree with that. But it continues from that point. It continues from that point. He goes. He brings that dog over. The dog does not alert. The dog does not alert. And so even though the dog does not alert, then now this officer, what he's doing this entire time by avoiding scanning the documents is he's creating his own bonus time. He is adding time to this immigration inspection. And so what does he do? The dog didn't alert. So now he requests permission to look into the vehicle. He gives him permission to look into the vehicle, well, directly at the suitcases. He goes in, looks at the suitcases. He still doesn't have – He was given permission to search at that point, right? Absolutely. He was given permission to search, and we don't contest that. But he still doesn't scan those documents. He still waits. He still waits. And the next thing he asks for is now that he's got no reasonable suspicion, he shouldn't, he's got no probable cause, and he's still refusing to scan those documents. Then we're in this now three minutes. He asks for consent to search the car, and then he scans the documents. And so what he's doing in essence is he's just creating more time. He's creating time when he should be finished with this immigration inspection. This immigration inspection should have ended, even if he had reasonable suspicion for drugs at some point, even if, as Your Honor said, that he might have – In the lining of the bag, I guess. Yes. How much time lapsed between the time that he stopped them and obtained their documents and he actually found the drugs in the lining of the bag? That timeline is not clear to me, Your Honor. But that timeline is not clear to me. That happened in secondary – that happened in secondary inspection. So I know that with this particular agent, it was three minutes and just a few seconds, probably three minutes, 10, 15 seconds. Three minutes and then he went to secondary. Three minutes – a little over three minutes and he went to secondary. And the very last thing he did was scan that immigration document. Even though he – that immigration inspection was really done. Even though it was really done, it took eight seconds for him to scan that document. The immigration inspection was really done. You said a couple of minutes ago that he was just creating time or he was extending the time. Extending the time for what? I mean once there was consent, what difference does it make that the time was extended? What I'm basically asking is why was he trying to extend the time? What was going to happen if there was more time involved than less? He was hoping to find – he was hoping to find drugs. He was hoping to find drugs, I believe, and that's what I think that his testimony reflects. He was hoping – But you acknowledged that it was okay for him to ask for consent, right? Yes. And then consent was given. So I still don't understand the adverse effect on your client of – if you're correct that the agent was just trying to extend the time. The adverse effect is this, is that we're there for an immigration inspection. We're there for an immigration inspection, which is supposed to be done immediately and it's supposed to cease immediately. It's the only purpose that we're there for. If we've got – if now there's no reasonable suspicion anymore, we've run the canine through, and there's no probable cause to search the vehicle, this officer is not finishing his job. What he's doing is he's asking – instead, instead of finishing his job, he's asking for consent, creating illegal bonus time. He's creating bonus time by – Well, your client could have said no at that point. He could have said no. He could have said no, but the officer's duty was to finish the inspection. If you're – and your client could have said no, and then what would the officer – he probably would have had to scan the documents and let him go. But he didn't say no. He said yes. And yes, and that's what did happen. But what our argument is is that that's improper. That's improper. He should have ended it. He should have ended it and not created bonus time. I think that in the opinion of United States v. Rodriguez, they talk about the situation of bonus time. I know that this is a little bit different. This isn't exactly that because in that particular case, the officer wrote his ticket and let – and should have let Rodriguez go. But here the officer, instead of finishing his job, which he has no reason not to finish it, he's adding time to this immigration inspection and refusing to finish the immigration inspection. And that's where I think that this Border Patrol agent went wrong. All right. Thank you, Mr. Bali. Thank you. You say time for rebuttal? Yes. Mr. Lurie. Thank you. May it please the Court. Anna Kuluri on behalf of the United States. Here the immigration inspection was diligently performed by Agent Flores. The defendant drove up to the inspection checkpoint at 502-58. Within – they start talking. He gives them his immigration documents, two forms – three forms, rather. Agent Flores noticed that the defendant is talking loudly. He appears nervous. He starts asking him questions about his itinerary, where are you going. All of this seems incredulous to him. It doesn't make sense. He thinks there's something going on here. As a result of his answers and the demeanor, he decides that he needs the assistance of a canine. So he walks to the back of the vehicle. He calls a canine. He waits there. We see agents coming. They talk. He looks at the back of the vehicle a few times. The canine inspector comes, starts doing the free air sniff around the vehicle, starting at the driver's front tire. At that point, Agent Flores goes back into the checkpoint booth. He starts – at this point, he over – both agents over here, the defendant voluntarily state that he was x-rayed when he came over the bridge. This also raises some inquiries in their minds as to what's going on here. They think that there's something going on. They're not exactly sure what it is, so they're going through the checkpoint with all of the tools available to them. At that point, Agent Flores, he verifies the bridge crossing. He asks if the suitcases came from Mexico. The defendant replies, yes, they did. And then he asks for permission to search the two oversized suitcases. And at that point, the defendant consents to it. So he goes to the back. They open up the back door. They go in. They inspect. This takes about a minute. They open up the flap. They see nothing in there. They close it. Immediately, he comes back. And at this point, after they close the door, he walks back to the checkpoint, and at that point, he asks the defendant if he would consent to a search of the secondary, to which he agrees. This total time takes three minutes, about a minute of which was prolonged by consent by the defendant for the search of the two suitcases inside. A couple of minutes at a checkpoint stop where the defendant consents, where there's reasonable suspicion, where everything that the officer did was in pursuant of the immigration checkpoint inspection is proper. And what, in your view, was the reasonable suspicion? We have a few things here. We have his nervous demeanor that the agent testified to. He started speaking loudly. We have this story about he comes to the checkpoint at 5. He's going to the outlets in San Marcos, which is about on a good day without traffic going through San Antonio at, you know, in the evening hours. It's about 3 hours and 15 minutes. The agent is familiar with the outlets. He's familiar with the time it closes, which is 9. He's aware of what they sell there. There's this story of the defendant buying shirts for $5 and reselling them in Mexico for profit. And all of this doesn't make sense to the agent. There's something off that he says. And, in fact, I believe he says there's inconsistencies. And so he starts to employ all the tools available. He asks questions. He has the dog. And that's the reasonable suspicion there. Unless there are any further questions, I'll save the remainder of my time and ask that you affirm the judgment and sentence. Thank you, Ms. Glory. Thank you. You saved time for rebuttal. Under questioning by Judge Hacker about the reason for employing that dog, Judge Hacker asks, but what do you think the canine is going to help you find? Are you looking for drugs? Are you looking for people? Are you looking for both? I mean, I don't know what's going through your mind when you stop and call the canine over. Answer, well, it's a tool we can use. In my experience, we've caught drugs. We've caught illegal aliens hiding in vehicles. Judge Hacker, I guess what I'm asking, are you satisfied with the number of people in the car at that point? Answer, yes. Judge Hacker, you thought, so did you call the drug, the dog over, in case he's going to alert for drugs? Is that the only reason? Answer, no. At, you know, I like to use the canine in this situation. So this is at 109, and so this officer did not articulate the facts for reasonable suspicion. He didn't suspect that there was drugs. He didn't suspect that there was aliens. He said, this is, I like to use the canine. It's a tool that we can use. That's what he said. All right. Thank you, Mr. Powers. Thank you. The case is under submission.